UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT PADUCAH
CIVIL ACTION NO. 5:15-CV-243-TBR-LLK

PRICILLA CAFFA-MOBLEY,                                          PLAINTIFF

v.

JAMES MATTIS, Secretary
U.S. DEPARTMENT OF DEFENSE,                                DEFENDANT

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 filed by Defendant James Mattis,[1] Secretary, United States Department of Defense ("the Secretary"). [R. 35.] Plaintiff Pricilla Caffa-Mobley responded, [R. 38], and the Secretary replied, [R. 39]. Fully briefed, this matter is now ripe for adjudication. For the reasons stated herein, the Secretary's Motion for Summary Judgment, [R. 35], is **GRANTED IN PART AND DENIED IN PART**.

**BACKGROUND**

The motion before the Court stems from Caffa-Mobley's Complaint, [R. 1], filed on November 30, 2015, alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.

In or around 2009, Caffa-Mobley applied for the position of Educational Aid, AD-1702-00, at Barkley Elementary School in Fort Campbell, Kentucky. [R. 35-2 at 30-34 (Caffa-Mobley Depo.).] Before she ever applied, Caffa-Mobley was in a car accident that limited her ability to lift anything and caused her to wear a neck brace to her interview. [*Id*. at 35.] During the

---

[1] The Court notes that, pursuant to Rule 25(d), James Mattis succeeded Ashton B. Carter as Secretary of Defense, and, therefore, Secretary Mattis may be automatically substituted as the defendant. *See* FED. R. CIV. P. 25(d)(1); *see, e.g., Cheney v. U.S. Dist. Court for D.C.*, 541 U.S. 913, 917 (2004) ("That is why federal law provides for automatic substitution of the new officer when the originally named officer has been replaced."); *Hafer v. Melo*, 502 U.S. 21, 25 (1991) ("Indeed, when officials sued in this capacity in federal court die or leave office, their successors automatically assume their roles in the litigation.").

interview, Caffa-Mobley informed the panel of principals in attendance, including the principal of Barkley Elementary, Rhonda Bennett, of the doctor-ordered limitation on her lifting things, or children, due to her surgery after the car accident. [*Id*. at 35-36.] In October of 2009, Caffa-Mobley was hired by the Department of Defense[2] as an Educational Aid at Barkley Elementary School. [R. 35-8 at 4 (Woods 2017 Dec.).] Her position was probationary for the first twelve months of her employment. [R. 35-8 at 4; R. 35-2 at 85.]

The position description of the job states that the purpose of the Educational Aid is to "assist teachers and other professional educators in instructional programs and classroom learning activities." [R. 35-8 at 18 (Position Description).] Additionally, Caffa-Mobley was assigned a kindergartener, Angelina, who was mentally and physically impaired and required Caffa-Mobley's constant care. [R. 35-2 at 50.] Caffa-Mobley testified that her duties with Angelina included, changing her diapers, feeding her, pushing her wheelchair, working with her on her motor skills, and getting her on and off the school bus. [*Id*. at 47-49.] Caffa-Mobley's description of her duties aligns with the "Special Needs Assignment" portion of the Educational Aid position description, which includes the statement: "In most cases, lifting will be required." [R. 35-8 at 19.] Any time Angelina needed to be lifted onto a changing table, lifted out of her wheel chair, etc., the school accommodated Caffa-Mobley by having another teacher or aid do it for Caffa-Mobley. [*See* R. 35-2 at 52-53; R. 35-10 at 2(Bennett Dec.).] Throughout that school year, Caffa-Mobley provided the school with doctor's notes stating that she could not lift anything greater than twenty-five pounds. [R. 35-10 at 2-3; R. 35-8 at 4.] Despite her lifting restriction, Caffa-Mobley received a four out of five rating, meaning her work was "Above

---

[2] Under 10 U.S.C. § 2164, the Secretary of Defense may "may enter into arrangements to provide for the elementary or secondary education of the dependents of such members of the armed forces and, to the extent authorized in subsection (c), the dependents of such civilian employees." 10 U.S.C. § 2164(a)(1). Barkley Elementary School was a "Domestic Dependent Elementary School" under this statute. [R. 35-8 at 2-3.] Therefore, Caffa-Mobley was employed by the Department of Defense as an Educational Aid.

2

Average," on her yearly evaluation in every category except "Appearance," for which she received a five, meaning "Excellent." [R. 38-3 at 1-2 (Annual Evaluation).] Bennett concurred with the results of the evaluation. [*Id*. at 3.]

On August 2, 2010, support staff returned to school from summer break. [R. 35-10 at 3.] The next day, Caffa-Mobley provided another doctor's note, this time with a restriction of no lifting anything greater than ten pounds without any end date for the restriction. [*Id*.] After consulting with Elgin Woods, a Supervisory Human Resources Specialist for the Department of Defense Education Activity, Principal Rhonda Bennett gave Caffa-Mobley a Reasonable Accommodations pamphlet, which included the forms for requesting reasonable accommodations. [R. 35-10 at 3; R. 35-8 at 4.] She asked Caffa-Mobley to complete and return the forms, including medical documentation to be filled out by her doctor, so they could be submitted to human resources. [R. 35-10 at 3.] Bennett claims that Caffa-Mobley never submitted the forms. [*Id*.] However, Woods stated in his declaration that Caffa-Mobley returned the forms on August 8, 2010, with a note from Aaron Johnson, a nurse practitioner, that said: "Until patient is cleared by Physical Therapy, I recommend that the patient lifts no more than 10 pounds." [R. 35-8 at 4, 34.] In the copy of the packet provided in evidence, Caffa-Mobley described the reasonable accommodation she required as someone to help her lift Angelina, push the wheelchair, and change diapers. [R. 35-8 at 28.] Otherwise, she specifically stated that she could do the rest of the job herself. [*Id*.]

On August 10, 2010, Caffa-Mobley alleges that she was attacked by a special needs student. [R. 35-2 at 53, 62-63; R. 1 at 3.] According to Bennett, Caffa-Mobley took two and a half weeks leave after the alleged incident. [R. 35-10 at 4.] Caffa-Mobley provided the school with a doctor's note stating that she could return to work on August 29, 2010 on "modified

duty." [R. 38-4 at 1(August 27 Doctor's Note).] Specifically the note stated: "Office or administrative duties only. No working w[ith] children for now." [*Id.*] Furthermore, the note ordered "[f]ull work while sitting" and to "[a]void lifting more than 5 lbs." [*Id.*]

On August 31, 2010, under the guidance of the human resources office, Bennett gave Caffa-Mobley a letter stating that the documentation provided by Caffa-Mobley was insufficient, and in order for the medical documentation to be acceptable it needed to contain: history of the specific medical condition, a summary of any clinical findings, an assessment of her current clinical status and plans for future treatment, a diagnosis/prognosis, the estimated date of full recovery, an explanation of the impact of the medical condition on her job duties, and an explanation of the medical basis for any conclusion that she would likely hurt herself or others by attempting to do her job. [R. 35-10 at 5; R. 35-14 at 2 (Memorandum for Caffa-Mobley).] Caffa-Mobley was required to provide this information by September 17, 2010. [R. 35-14 at 2.] Caffa-Mobley delivered this letter to her physician at Premier Medical Group. [R. 38-6 at 1 (Annotated Letter).] On an annotated copy of the letter, Melody Walls of the Premier Medical Group noted that she received the letter on September 27 and that she spoke with Bennett about responding to the letter on September 28. [*Id.*] Bennett did not mention this conversation in her declaration. [*See generally* R. 35-10.]

During the first three weeks of September, Caffa-Mobley provided Bennett with two doctor's notes from Premier Medical Group, both stating that she should avoid lifting over five pounds, do only office work, and not work with children. [R. 35-10 at 5-6; R. 35-2 at 82-84; R. 35-15 at 3-4 (Doctor's notes).] Bennett states that she explained to Caffa-Mobley that doctor's notes would not be sufficient to provide all of the information required by human resources. [R. 35-10 at 6.] After the September 17 deadline had passed, specifically on September 24, 2010,

Caffa-Mobley informed Bennett that she believed the memorandum was invalid because Bennett never signed it. [*Id*.] So, after consulting with the human resources offices, Bennett re-printed the letter with a new due date of October 1, 2010 and made sure Caffa-Mobley signed it to memorialize that she received it. [*Id*.]

During this time, due to her restrictions, Caffa-Mobley had to work in the library grading papers and putting away books. [R. 35-10 at 6; R. 35-2 at 84.] In order to fulfill Caffa-Mobley's duties with Angelina, as recorded in Angelina's Individual Educational Plan ("IEP"), the school was responsible for finding someone else to provide those services to Angelina. [R. 35-10 at 7; R. 35-12 at 3 (Instructional Systems Specialist, Brake, Dec.).] In fact, Woods stated that Barkley Elementary paid a substitute teacher to fill Caffa-Mobley's position for the month of September. [R. 35-8 at 7.] Bennett and Woods inquired about available vacancies for other positions in the school district that would be appropriate for Caffa-Mobley; however, allegedly, the only positions available either required lifting or working with children. [R. 35-8 at 7; R. 35-10 at 5.] Caffa-Mobley testified that after the incident on August 10, Bennett told her in front of students' parents that the school "didn't have a need for [her]." [R. 35-2 at 60.] Caffa-Mobley also testified that Bennett told her to "get out of the school and leave after being on workman comp [sic]," and that she needed "to go back and do the job [she] was hired to do." [*Id*.] Furthermore, Caffa-Mobley testified that Bennett was "screaming and hollering at [her] in front of people all the time . . .." [*Id*. at 61.]

On September 27, 2010, Caffa-Mobley submitted a request for leave for October 1 through October 4. [R. 35-10 at 7.] Along with Caffa-Mobley's previous failure to turn in the required medical documentation, this submission for leave caused Bennett to believe that Caffa-Mobley would not be turning in the required medical documentation by October 1 and that

Caffa-Mobley intended to return to work after completing her twelve month probationary period on October 4. [*Id.*] Bennett concluded that due to Caffa-Mobley's medical condition, "she could not work with or around children and that she was therefore unable to perform the essential duties of her position." [*Id.*] On September 30, 2010, based on the guidance of the human resources office, Bennett gave Caffa-Mobley a termination letter thereby ending her employment. [R. 35-10 at 7; R. 35-18 at 6 (Caffa-Mobley Dec.); R. 35-8 at 91 (Termination Letter).] The letter specifically attributed her termination to the fact that her medical condition rendered her unable to perform the essential duties of her position and precluded accommodation. [R. 35-8 at 91.] Furthermore, it states that as a "probationary/trial period employee, you are not entitled to grievance or appeal rights." [*Id.*]

According to Woods, he coordinated with his staff and the legal office on the process involved in drafting and supplying the termination letter "to ensure that Plaintiff was given an opportunity to submit any new medical documentation that would change her situation." [R. 35-8 at 9.] In contrast, Caffa-Mobley does not provide any recollection of receiving an opportunity to submit such documentation. [R. 35-18 at 7.] Woods stated that on October 7, 2010, the school received a letter, dated October 1, 2010, from an attending physician, Dr. Donald Huffman, regarding Bennett's earlier request for further medical information. [*Id.*] In the letter, Dr. Huffman diagnosed Caffa-Mobley with "an exacerbation of a cervical strain" and estimated her date of full recovery, at least to "her state of function prior to August 10, 2010," to be October 15, 2010. [R. 38-7 at 1 (Huffman Letter).]

Subsequently, Caffa-Mobley filed claims of race and disability discrimination with the Equal Employment Opportunity Commission ("EEOC") that were dismissed. [R. 35-10 (EEOC Order).] Specifically, Administrative Law Judge Momah found that Caffa-Mobley "could not

perform the essential functions of her job with or without an accommodation," and that "she failed to identify similarly situated employee [sic] who was on probation and was not terminated." [R. 35-20 at 46-47 (EEOC Hearing Transcript).] Furthermore, Judge Momah found that the agency articulated a legitimate, non-discriminatory reason for terminating Caffa-Mobley but Caffa-Mobley failed to show pretext for that reason. [*Id.*]

On November 30, 2105, Caffa-Mobley filed a complaint with this Court, [R. 1], and on December 14, 2017, the Secretary filed the Motion for Summary Judgment that is before the Court, [R. 35].

## STANDARD

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The Court "may not make credibility determinations nor weigh the evidence when determining whether an issue of fact remains for trial." *Laster v. City of Kalamazoo*, 746 F.3d 714, 726 (6th Cir. 2014) (citing *Logan v. Denny's, Inc.*, 259 F.3d 558, 566 (6th Cir. 2001); *Ahlers v. Schebil*, 188 F.3d 365, 369 (6th Cir. 1999)). "The ultimate question is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Back v. Nestlé USA, Inc.*, 694 F.3d 571, 575 (6th Cir. 2012) (quoting *Anderson*, 477 U.S. at 251–52).

As the party moving for summary judgment, the defendant must shoulder the burden of showing the absence of a genuine dispute of material fact as to at least one essential element of Plaintiff's claims. Fed. R. Civ. P. 56(c); *see also Laster*, 746 F.3d at 726 (citing *Celotex Corp. v.*

7

*Catrett*, 477 U.S. 317, 324 (1986)). Assuming the defendant satisfies his or her burden of production, the plaintiff "must—by deposition, answers to interrogatories, affidavits, and admissions on file—show specific facts that reveal a genuine issue for trial." *Laster*, 746 F.3d at 726 (citing *Celotex Corp.*, 477 U.S. at 324).

## DISCUSSION

Caffa-Mobley alleges two different claims against the Secretary: (1) discrimination due to her disability in violation of the Americans with Disability Act ("ADA") and (2) racial discrimination in violation of Title VII of the Civil Rights Act. [R. 1 at 4-5.]

As a preliminary issue, the Court must address the Secretary's argument that Caffa-Mobley's disability discrimination claim should be dismissed because the ADA specifically does not apply to the United States when it, or "a corporation wholly owned by the government of the United States," is the employer in the matter. [R. 35-1 at 13 (quoting 42 U.S.C. § 12111(5)(B)(i)) (Secretary's Motion for Summary Judgment).] Indeed, "[t]he Rehabilitation Act, not the Americans with Disabilities Act (ADA), constitutes the exclusive remedy for a federal employee alleging disability-based discrimination." *Jones v. Potter*, 488 F.3d 397, 403 (6th Cir. 2007). However, the two statues run roughly parallel to one another, and, the ADA "standards apply in Rehabilitation Act cases alleging employment discrimination." *McPherson v. Michigan High Sch. Athletic Ass'n, Inc.*, 119 F.3d 453, 459–60 (6th Cir. 1997) (quoting *Burns v. City of Columbus,* 91 F.3d 836, 842 (6th Cir. 1996)). Thus, the Court will interpret Caffa-Mobley's claim of disability discrimination as one brought under the Rehabilitation Act.[3] *See, e.g., Arias v. McHugh*, No. 2:09-690 WBS GG, 2010 WL 2511175, at *12 (E.D. Cal. June 17, 2010) ("While

---

[3] The Court notes that the Secretary applies the ADA framework in the Motion for Summary Judgment but acknowledges the difference in language between the requirements of the ADA and the Rehabilitation Act. [*See* R. 35-1 at 14.] Specifically, the Secretary highlighted the Rehabilitation Act's requirement that the defendant's actions were done "solely by the reason of" the plaintiff's disability. [*Id.*]

plaintiff's third cause of action for disability discrimination is brought under the ADA, the court will interpret it as one brought under the Rehabilitation Act.").

I.     **Whether Caffa-Mobley was Qualified for the Position**

The Secretary argues that Caffa-Mobley cannot establish a prima facie case of disability discrimination under the ADA or racial discrimination under Title VII because Caffa-Mobley was not qualified for the position of Educational Aid. [R. 35-1 at 14.] When the plaintiff fails to present direct evidence of discrimination, as is the case here, courts analyze Title VII disparate treatment claims under the *McDonell Douglas* framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973). Under that framework, the burden initially lies with the plaintiff to establish a prima facie case of discrimination. *See id.* If the plaintiff establishes a prima facie case of discrimination, the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action. Assuming it does so, the burden shifts back to the plaintiff to demonstrate the defendant's proffered reason is merely pretext for unlawful discrimination. *See id.* at 802; *Hollins v. Atl. Co.*, 188 F.3d 652, 658 (6th Cir. 1999).

To establish a prima facie case of disability discrimination under the Rehabilitation Act, the plaintiff must establish each of the following elements:

> (1) that [she] is disabled, (2) that [she] is otherwise qualified for the job, with or without reasonable accommodation, (3) that [she] suffered an adverse employment action, (4) that [her] employer knew or had reason to know of [her] disability, and (5) that, following the adverse employment action, either [she] was replaced by a nondisabled person or [her] position remained open.

*Jones*, 488 F.3d at 404. Similar to a prima facie case of disability discrimination, racial discrimination contains the same requirement of being qualified for the job in question. The elements required to establish a prima facie case of racial discrimination under Title VII are as follows:

(1) plaintiff is a member of a protected group, (2) plaintiff was subject to an adverse employment decision, (3) plaintiff was qualified for the position, and (4) plaintiff was either replaced by a person outside of the protected class or was treated differently than similarly situated, non-protected employees.

*Russell v. Univ. of Toledo*, 537 F.3d 596, 604 (6th Cir. 2008). In the Motion for Summary Judgment, the Secretary solely disputes the factor of whether Caffa-Mobley was qualified for the position of Educational Aid. [R. 35-1 at 15.] Thus, the Court will only analyze this factor for either prima facie case of discrimination.

### A. "Qualified" Under the ADA

Section 12112(a) of the ADA states: "No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The statute defines a "qualified individual" as:

> an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires. For the purposes of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

42 U.S.C. § 12111(8).

Specifically, the Secretary argues that working with children was an essential function of the Educational Aid position, and, according to the doctor's notes provided by Caffa-Mobley, she was unable to work with children. [R. 35-1 at 15.] Therefore, the Secretary concludes, Caffa-Mobley was unable to perform an essential function of her job, making her "unqualified." [*Id*.] Caffa-Mobley responds that her limitation on working with children was only temporary, and that she was only concerned about continuing her previous accommodation for lifting Angelina.

[R. 38 at 2.] As the ADA requires the moving party to be a "qualified individual," the Court must decide whether Caffa-Mobley could perform the essential functions of her position, here working with children, with or without a reasonable accommodation. *See* 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(8).

1. **Essential Function**

In considering the Secretary's argument, the Court must first decide whether working with children is an essential function of the Educational Aid position. Caffa-Mobley does not outright dispute that working with children is not an essential function, rather, she argues that the Court should not focus on this limitation. [R. 38 at 2.] However, if working with children is an essential function of the position that Caffa-Mobley was unable to fulfill, the statute categorizes her as "unqualified" and the Secretary should be granted summary judgment. *See* 42 U.S.C. § 12112(a); 42 U.S.C. § 12111(8). Thus, it is an issue the Court must address.

"Ordinarily, the question of whether a job function is essential 'is a question of fact that is typically not suitable for resolution on a motion for summary judgment.'. . . Thus, we will not grant summary judgment when the 'evidence on the issue is mixed.'" *Bush v. Compass Grp. USA, Inc.*, 683 F. App'x 440, 446 (6th Cir. 2017). However, in the case at hand, it would seem to be a matter of common sense that working with children is an essential function of an Educational Aid at an elementary school. The ADA regulations, which provide several non-exclusive factors to aid in the consideration, further solidify the fact that working with children is an essential function of the position. *See* 29 C.F.R. § 1630.2(n)(3).[4] For instance, both the

---

[4] "(3) Evidence of whether a particular function is essential includes, but is not limited to:
    (i) The employer's judgment as to which functions are essential;
    (ii) Written job descriptions prepared before advertising or interviewing applicants for the job;
    (iii) The amount of time spent on the job performing the function;
    (iv) The consequences of not requiring the incumbent to perform the function;
    (v) The terms of a collective bargaining agreement;
    (vi) The work experience of past incumbents in the job; and/or
    (vii) The current work experience of incumbents in similar jobs."

position description for an Educational Aid with a "Special Needs Assignment" and Bennett's Declaration describe Caffa-Mobely's position as one that requires interacting one-on-one with a child. [*See* R. 35-8 at 19; R. 35-10 at 6-7.] As the Secretary points out, even Caffa-Mobley's personal description of her position involved working with children throughout the day. [R. 35-2 at 47-48.] Furthermore, as a consequence of Caffa-Mobley's inability to work with children, Bennett had to hire a substitute to ensure that Angelina's needs were met. [R. 35-10 at 6-7.] Therefore, the Court finds that the evidence here is not "mixed" and working with children was an essential function of the position of Educational Aid at Barkley Elementary School.

### 2. Reasonable Accommodation

Secondly, the Court must consider whether allowing Caffa-Mobley to continue working on light duty in the library until she was able to work with children again was a reasonable accommodation. "When accommodation is necessary to enable a plaintiff to perform the essential functions of the position in question, it is the plaintiff's burden to propose an accommodation that is 'objectively reasonable.'" *Keith v. Cty. of Oakland*, 703 F.3d 918, 927 (6th Cir. 2013) (quoting *Kleiber v. Honda Am. Mfg.*, 485 F.3d 862, 870 (6th Cir. 2007)). A reasonable accommodation includes modifying the responsibilities of a disabled employee. *Rorrer v. City of Stow,* 743 F.3d 1025, 1039 (6th Cir. 2014). "A suggested accommodation is not reasonable if it requires eliminating an 'essential' function of the job." *Id.; see also* 42 U.S.C. § 12111(8); *Kleiber,* 485 F.3d at 870. The Secretary asserts two arguments on this point: (1) Caffa-Mobley never requested an accommodation, so there was no obligation under the ADA to provide one to her, and (2) even if clerical work in lieu of working with children qualifies as a proposed qualification, it is not reasonable because it poses an undue hardship on her employer. [R. 35-1 at 18-19.]

---

29 C.F.R. § 1630.2(n)(3).

As to the first argument, the Secretary cites the Sixth Circuit as stating: "An employer has no obligation to provide an accommodation, however, unless the employee requests one." *Waggoner v. Carlex Glass Am., LLC*, 682 F. App'x 412, 416 (6th Cir. 2017). Yet, later in the same opinion, the court stated: "the employee need not use magic words like 'accommodation' or 'disability,'" but "the employee must 'make it clear' both that he is making a request and that he is doing so because of his disability." *Id*. Furthermore, in *Aldini v. Kroger Co. of Michigan*, the Sixth Circuit stated: "In certain situations, a request for accommodation can be inferred by context." 628 F. App'x 347, 350–51 (6th Cir. 2015) (citing *Smith v. Henderson,* 376 F.3d 529, 535 (6th Cir. 2004)). Although the Secretary argues that Caffa-Mobley never requested an accommodation, Caffa-Mobley clearly received one. Moreover, in her declaration, Bennett answered the question of "Did you grant the accommodation?" by stating:

> Ms. Mobley received the accommodations identified in the doctor's notes she provided me for essentially the entire year that she worked at the school. In fact, because of the doctor's notes in late August and September which stated that she could not work with children, I could only have her work in the school library grading papers. This was after she had been out of school for two and one-half weeks on leave.

[R. 35-10 at 4.] Although initially discussing Caffa-Mobley's lifting restrictions, Bennett went on to describe Caffa-Mobley going on leave and subsequently working in the library—seemingly implying that this too was an accommodation. The Court finds that Caffa-Mobley made it clear to Bennett through the doctor's notes she provided that restricted her from working with children that she needed to be placed in a different position at the school where she would not be around children due to her injury. The Court notes that the Sixth Circuit has held that a plaintiff made a request when the plaintiff supplied a doctor's note describing the plaintiff's limitations. *See, e.g., Green v. BakeMark USA, LLC,* 683 F. App'x 486, 492 (6th Cir. 2017) (categorizing a doctor's note laying out a restrictive work schedule for thirty days as a proposed accommodation); *Aldini*,

13

628 F. App'x at 351 (finding that a doctor's note setting out a lifting and scheduling restriction, without an end date, served as a request for an accommodation, although it was retracted by a subsequent doctor's note that cleared the plaintiff to work without restrictions). Thus, the Court finds that, at the very least, there is a genuine dispute of material fact over whether Caffa-Mobley requested an accommodation.

  Secondly, the Secretary argues that even if Caffa-Mobley did propose an accommodation through an initial leave period and subsequently working in the library, that accommodation is unreasonable because it would impose an undue hardship on the school by passing on one of Caffa-Mobley's essential functions to another employee. [R. 35-1 at 19.] Indeed, as the Secretary cites in the Motion for Summary Judgment, the Sixth Circuit has stated that "the ADA does not require employers to accommodate individuals by shifting an essential job function onto others." *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719, 729 (6th Cir. 2000). Though, the Court notes that the cases cited by the Secretary for this notion all involve a permanent accommodation rather than a temporary accommodation.[5] In contrast, this Circuit has found that a medical leave of absence can constitute a reasonable accommodation under appropriate circumstances, particularly when the amount of leave is not indefinite. *See Cehrs v. Northeast Ohio Alzheimer's Research Center,* 155 F.3d 775 (6th Cir. 1998) (finding a genuine issue of material fact as to whether an extended medical leave of absence of one month, after eight weeks of leave, was a reasonable accommodation under the ADA when the defendant routinely granted leave to employees); *Walsh v. United Parcel Serv.,* 201 F.3d 718, 727 (6th Cir. 2000) ("[W]hen the

---

[5] Respectfully, the Secretary cites to *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753 (6th Cir. 2015), *Hoskins v. Oakland Cty. Sheriff's Dep't*, 227 F.3d 719 (6th Cir. 2000), and *Wardia v. Justice & Pub. Safety Cabinet Dep't of Juvenile Justice*, 509 F. App'x 527 (6th Cir. 2013). [R. 35-1 at 19.] All of which contain proposed accommodations of an indefinite length.

requested accommodation has no reasonable prospect of allowing the individual to work in the identifiable future, it is objectively not an accommodation that the employer should be required to provide."). Even when the accommodation is an assignment of light duty rather than leave, the Sixth Circuit has reasoned that an assignment of light duty may be appropriate unless it is of a permanent nature. *See Brown v. Chase Brass & Copper Co.*, 14 F. App'x 482, 488 (6th Cir. 2001) ("[A]n employer has no obligation to create a permanent light duty post when none previously existed."); *see also Meade v. AT&T Corp.*, 657 F. App'x 391, 396 (6th Cir. 2016) ("[W]e have applied this rule to hold that an employer need not create a permanent light-duty position.").

In response to the Secretary, Caffa-Mobley has provided evidence suggesting that her restriction from working with children was merely temporary, and that she could have returned to working with children as soon as October 15, 2010, i.e., two weeks after she was terminated. For instance, one of the four doctor's notes from Premier Medical Group, states "No working with children for now," while the other three only state that she should not work with children without a time limitation. [R. 35-15 at 1-5.] Also, the letter to Bennett from Dr. Huffman stated that, as of October 1, 2010, Caffa-Mobley was "safe to perform any sort of administrative or monitoring duties so long as she is not required to do a great deal of bending or lifting with regard to children or sudden moves." [R. 38-7 at 1.] Furthermore, Dr. Huffman estimated her date of full recovery to her state of function prior to August 10, 2010 to be October 15, 2010.[6] [*Id.*]

---

[6] The Court notes that Dr. Huffman's letter to the school was dated as August 1, 2010, i.e. the deadline given to Caffa-Mobley to provide medical documentation by Bennett. However, the letter did not actually arrive until August 7. The Secretary has not argued that the information in the letter should not be considered due to its late arrival. Furthermore, Bennett did not abide by this deadline when she fired Caffa-Mobley on September 30 for not providing the medical information she previously said was due on October 1. Thus, without any sort of argument from the Secretary or further evidence that the deadline should be enforced as part of a valid agreement, the Court considered the letter in making its decision.

Overall, Caffa-Mobley's accommodation would entail two and a half weeks of leave and about a month and a half of light duty work in the library. [R. 38-4 at 1; R. 1 at 4.] All together that is a little over two months. The Sixth Circuit has stated: "Our review of case law in this and other circuits disclosed no cases where an employer was required to allow an employee to take a leave of absence for well in excess of a year-let alone indefinitely-as a reasonable accommodation to the employee's disability." *Walsh*, 201 F.3d at 727. Furthermore, the Equal Employment Opportunity Commission ("EEOC") has stated that six months is beyond a "reasonable amount of time" for an employer to keep a disabled employee employed while the employee waits for an appropriate, vacant position to become available. U.S. Equal Emp. Opportunity Comm'n, ENFORCEMENT GUIDANCE: REASONABLE ACCOMMODATION AND UNDUE HARDSHIP UNDER THE AMERICANS WITH DISABILITIES ACT, 2002 WL 31994335, at *21. Caffa-Mobley's two months of accommodations fall well below either of the time limits described by the Sixth Circuit or the EEOC. Therefore, the Court finds that there is a genuine dispute of material fact as to whether Caffa-Mobley's accommodation was reasonable.

In sum, viewing the record in the light most favorable to the nonmoving party, the Court finds that there is a genuine dispute of material fact as to whether Caffa-Mobley was qualified for the position of Educational Aid pursuant to the ADA and Rehabilitation Act. The Secretary's Motion for Summary Judgment as it pertains to Caffa-Mobley's claim of disability discrimination is DENIED.

### B. "Qualified" Under Title VII

The Secretary argues that summary judgment is justified for both counts, including racial discrimination under Title VII, because Caffa-Mobley was not qualified for her position. [R. 35-1 at 14.] However, the Secretary argues this point purely in the context of the ADA. As the Court has already found that there is a genuine dispute of material fact as to whether Caffa-Mobley was

qualified to be an Educational Aid, the Court will disregard this argument as it relates to the racial discrimination claim.

## II. Racial Discrimination

The Secretary also argues that Caffa-Mobley has not established the fourth factor of a prima facie case of racial discrimination under Title VII, i.e., "plaintiff was either replaced by a person outside of the protected class or was treated differently than similarly situated, non-protected employees." *Russell*, 537 F.3d at 604. Here, Caffa-Mobley has not alleged that she was replaced; rather, she argues that she was treated differently than her co-worker, Carmen Mai. [R. 38 at 10.] Conversely, the Secretary claims that Mai was not similarly situated to Caffa-Mobley because Caffa-Mobley was a probationary employee and Mai was not. [R. 35-1 at 21.]

As the Secretary points out, this Court has previously stated: "The Sixth Circuit has 'found probationary status to be a relevant consideration for the similarly-situated inquiry' on multiple occasions." *Cassell v. Brennan*, No. 3:14-CV-449-TBR, 2016 WL 6123242, at *4 (W.D. Ky. Oct. 19, 2016) (Russell, J.). In *Cassell*, the Court found that probationary and non-probationary employees at the United States Postal Service were too different to be compared as similarly situated employees. *Id*. at *5. More specifically, this Court found that "[p]robationary employees are not entitled to the application of progressive discipline, may be disciplined and removed without just cause, and may not avail themselves of certain grievance procedures under the CBA. Conversely, non-probationary employees are entitled to progressive discipline, and just cause is required to terminate them." *Id*. at 4 (citations omitted). The Court also quoted the Sixth Circuit as stating: "A probationary period of employment permits a company to weed out or eliminate undesirable employees." *Id*. at 5 (quoting *Cooper v. N. Olmsted*, 795 F.2d 1265, 1270-71 (6th Cir. 1986).

In his declaration, Woods highlighted differences between probationary and non-probationary employees that are nearly identical to the language in *Cassell*. For example, Woods stated that "[n]on-probationary employees are entitled to the application of progressive discipline, but probationary employees are not . . .." and " [j]ust cause is required for discipline of non-probationary employees. Just cause is not required for discipline of probationary employees." [R. 35-8 at 12-13]. Similar to the quote from *Cooper*, Woods stated that "[w]ith a probationary employee, management is determining if the employee is qualified to continue for remainder of appointment." [*Id.*] Furthermore, according to the Master Labor Agreement ("MLA") that governs the school, procedural rights, such as advanced notice of the adverse action or the opportunity to prepare an answer, "do not apply to the discharge or separation of an employee during a probationary/trial period." [R. 35-8 at 99-102.]

Both the case law and the evidence in the record before the Court clearly show that probationary and non-probationary employees are not to be compared as similarly situated. Therefore, the Court finds that, after viewing the record in the light most favorable to the nonmoving party, there is no genuine dispute of material fact over whether Caffa-Mobley and Mai were similarly situated. As a probationary employee and a non-probationary employee, they were not. Thus, the Secretary's Motion for Summary Judgment as it pertains to Caffa-Mobley's claim of racial discrimination under Title VII is GRANTED.

### III. Legitimate, Non-Discriminatory Reason for Caffa-Mobley's Termination

The Secretary argues that even if Caffa-Mobley established a prima facie case of disability discrimination, the school still presented a non-discriminatory reason for firing Caffa-Mobley, i.e., she could not work with children. [R. 35-1 at 22-23.] The Secretary claims Caffa-Mobley has not successfully demonstrated that this non-discriminatory reason was a mere pretext for discrimination, as required under the *McDonell Douglas* framework. [*Id.* at 23.]

18

The Court has already held that there is a dispute of material fact over whether Caffa-Mobley was qualified for the position of Educational Aid. Specifically, that involves the question of whether Caffa-Mobley was able to work with children after being given another two weeks of light duty-type work in the library. It would be contradictory to now decide that Caffa-Mobley was not able to work with children, and, therefore, the school did not fire her due to discrimination but her inability to perform this essential function of her position. Thus, the Court will disregard the Secretary's argument.[7]

**CONCLUSION**

For the reasons stated herein, the Secretary's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED.**

cc: Counsel of Record

---

[7] The Court acknowledges the Secretary's argument that it would be odd for Bennett, the same actor who participated in hiring Caffa-Mobley, to thereafter fire Caffa-Mobley due to discriminatory animus. [R. 25-26.] This is known as the "same actor inference." *See Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003). However, not only has the Sixth Circuit found that this inference is not mandatory, it also stated: "We therefore specifically hold that where, as in this case, the factfinder decides to draw the same-actor inference, it is insufficient to warrant summary judgment for the defendant if the employee has otherwise raised a genuine issue of material fact." *Id*. at 573–74. As the Court has already held that Caffa-Mobley raised a genuine issue of material fact, the Court will not warrant summary judgment based on the "same actor inference."